737 So.2d 885 (1999)
STATE of Louisiana
v.
Jerry Jerome HILLS.
No. 98 KW 1840.
Court of Appeal of Louisiana, First Circuit.
May 14, 1999.
*886 Scott M. Perrilloux, District Attorney by Richard R. Pickens, II, Assistant District Attorney, Amite, Counsel for Plaintiff/Respondent, State of Louisiana.
Martin E. Regan, Jr., New Orleans, Counsel for Defendant/Relator, Jerry Jerome Hills.
Before: GONZALES, KUHN and WEIMER, JJ.
GONZALES, J.
Relator, Jerry Jerome Hills, was charged by grand jury indictment with first degree murder, in violation of La. R.S. 14:30. He pled not guilty. After hearings on April 17 and May 18, 1998, the trial court granted the State's Prieur motion,[1] ruling that certain evidence of other crimes allegedly committed by relator were admissible at trial. Relator applied for supervisory writs with this court, but the application was denied. State v. Hills, 98 KW 1840 (La.App. 1 Cir. 10/8/98). He then applied for supervisory writs with the Louisiana Supreme Court. On November 18, 1998, the Louisiana Supreme Court granted the writ application and remanded the matter to this court for briefing, argument, and opinion on the appropriate burden of proof and the admissibility of the other crimes evidence under La. C.E. art. 404(B). State v. Hills, 98-2818 (La.11/18/98), 728 So.2d 876.
Relator contends the trial court erred in granting the State's Prieur motion. The Prieur evidence at issue herein is that relator sexually assaulted four female victims in separate incidents between December of 1990 and late 1995 or early 1996. Specifically, he argues the trial court erred in applying a lesser burden of proof than the "traditional" clear and convincing standard of proof required by State v. Prieur, 277 So.2d 126 (La.1973), and its progeny when it ruled that the other crimes evidence was admissible under La. C.E. art. 404(B). He argues if the clear and convincing evidence standard were applied to these four separate acts, they would not be admissible at trial. Relator attacks the credibility of each victim and asserts there is not clear and convincing evidence of his commission of these separate sexual assaults. He also contends the State seeks to introduce this other crimes evidence to establish his guilt of the instant offense "by demonstrating that he is a bad person."
*887 The State argues that, with the repeal of La. C.E. art. 1103 in 1995, the clear and convincing burden of proof is no longer applicable to the admissibility of other crimes evidence. According to the State, under current La. C.E. art. 1104, the burden of proof in an "other crimes" hearing is now "identical to the burden of proof required by the Federal Rules of Evidence Article IV, Rule 404," which has been interpreted by the United States Supreme Court to mean that "similar acts" and other Rule 404(B) evidence "should be admitted if there is sufficient evidence to support a finding by the jury that the defendant committed the similar act." Huddleston v. United States, 485 U.S. 681, 685, 108 S.Ct. 1496, 1499, 99 L.Ed.2d 771 (1988).
Generally, evidence of criminal offenses other than the offense being tried is inadmissible as substantive evidence because of the substantial risk of grave prejudice to the defendant. State v. McDermitt, 406 So.2d 195, 200 (La.1981). In order to avoid the unfair inference that a defendant committed a particular crime simply because he is a person of criminal character, other crimes evidence is inadmissible unless it has an independent relevancy besides simply showing a criminal disposition. State v. Lafleur, 398 So.2d 1074, 1080 (La.1981).
Louisiana Code of Evidence article 404(B)(1) provides:
Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.
At the Prieur hearing on April 17, 1998, the facts of the instant offense were established through the testimony of Hammond City Police Detective Kevin Grob. Det. Grob testified that he participated in relator's arrest in March of 1996, for the murder of S.H., the five year old victim, who was relator's niece. A witness had identified relator as the person she saw on the day of the victim's disappearance driving his vehicle away from the pond where the victim's body was later found. Other witnesses who had been fishing informed Grob that they saw the same vehicle which was "backed into some brush" near the pond; one of them went closer and heard what he thought was "a child whimpering" in the backseat of the car.
The victim was last seen alive at her grandmother's house in Hammond, which was a few miles from the pond.[2] Relator had been at the house when the child disappeared. DNA testing revealed that blood matching the victim's was found on the back seat of the car relator was seen in at the pond that day.
When asked if there was evidence the five year old victim had been raped, Det. Grob indicated the coroner's report showed anal and vaginal trauma, but due to decomposition of the body, it was not possible to determine whether the child was raped. There was also evidence of blunt trauma to the head as the cause of death, but no indication of what had caused the trauma.
Det. Grob stated there was no information suggesting relator was to take the victim anywhere on the day of the murder. Although unable to determine a motive for the murder, Det. Grob stated he established relator had the opportunity to commit the murder because of "holes" in his *888 story as to his whereabouts during the particular time period in question. The pond where the victim's body was recovered is located south of Interstate 12, but north of Ponchatoula, Louisiana. The victim's body was clothed when found.
Facts regarding the previous crimes committed by relator were elicited from several witnesses at the Prieur hearing. L.D., the alleged victim of an incident occurring in January of 1994, did not testify; however, evidence of this incident was presented through the testimony of Sergeant Melissa Sperling of the St. John the Baptist Parish Sheriffs Office. At the time of this incident, Sgt. Sperling worked in the Sheriffs Office Juvenile Division. On January 3, 1994, she interviewed L.D. at the North Oaks Medical Center in Tangipahoa Parish regarding her reported rape. L.D., who was fifteen years old at that time, gave a written statement detailing the following.
Sometime around midnight, L.D. needed a ride from Hammond, Louisiana, to the hospital in Ponchatoula where her mother had been admitted; she accepted a ride with relator because a family friend, Melvin Austin, told her it would be okay. However, instead of taking L.D. to the hospital, relator continued past the appropriate exit and drove to an isolated area off U.S. Highway 51 south of Manchac, Louisiana, where he raped her inside his truck. L.D. said she did not consent to relator's demand for sex, but she was afraid of relator, and he told her he would leave her alone on a dark road if she did not comply. Additionally, according to Austin, L.D. indicated relator had threatened to beat her up.
After the rape, they got dressed and relator then took L.D. to the hospital in Ponchatoula where she checked on her mother; but she did not report the rape at that time. Relator waited outside to take L.D. home from the hospital, but when she got in the truck, he told her he was taking her some place other than home. L.D. was able to jump out of the truck and saw Austin, who accompanied her to her grandmother's house where they reported the rape.
L.D. was examined after the rape. While Sgt. Sperling was not familiar with the results of the rape kit, she indicated the doctor found inactive spermatozoa on the slide. Although a warrant was issued for relator's arrest, he was not located and arrested until 1996. In his statement, relator denied knowledge of the rape. He admitted knowing L.D.'s family and stated he had dated her mother. Relator denied that L.D. had ever been in his truck; however, Austin said he had seen L.D. get into relator's truck. Austin also indicated that, as L.D. was getting out of the truck, he heard relator tell L.D. that he did not care who she told.
S.R., age forty-three, testified she has known relator for a long time, but had no regular contact with him. She was the mother of two children fathered by one of relator's brothers, Anthony Hills. On December, 10, 1990, she needed a ride from Hammond to Kentwood, Louisiana, where she wanted to pick up her food stamps. She told relator she would buy him some gas if he would take her there. On the way, relator's truck broke down on Interstate 55, which he blamed on her. After they waited part of the morning on the side of the road, he hit her in the forehead with the claw end of a hammer and told her she would do what he said and she would not tell anyone. He then raped her numerous times during the day, hit her with the hammer two more times, and told her she was going to be his woman from then on whenever he wanted her.
Around dark, they walked to a store where another of relator's brothers, Ray, came to get them; S.R. did not report the rape until after she picked up her children from the babysitter's house where she had left them. She also went to the hospital, wrote out a statement, and had a warrant issued for relator's arrest. Relator was not arrested for the crime as he could not *889 be located. S.R. did not follow up on the matter because she had moved to Baton Rouge, Louisiana.
S.R. acknowledged the statement she gave the day of the rapes was more accurate than her present recollection and testimony. In the statement, she alleged that she was forced to perform oral sex if she wanted to live and that relator threatened to cut her tongue out because she would tell someone. She explained that she was afraid relator would kill her with the hammer if she did not do what he wanted at the time.
S.B., age forty-four, testified she went to school with relator and had known him just about all her life. About three years prior to the hearing, she was walking home from a bar in Hammond when relator offered her a ride. Instead of taking her the four or five blocks to her home, relator sped up and drove out to a dark, secluded spot off a road near the airport. Relator told her: "you gonna either f___ or walk." S.B. replied that she was not going to do anything and that she wanted to go home. Relator punched her in the face. The second blow knocked out one of her teeth. After he hit her a third time and told her he would hurt her if she did not do what he wanted, he then raped her in the car. After the rape, relator got out to straighten out his clothes, acting like nothing had happened. He asked her where she wanted to be dropped off and he drove her home.
After S.B. got out of the car, she leaned back in through the window and struck relator in the face with a quart beer bottle she had found in the backseat of his car. She was trying to blind him, but just broke his nose. She then ran and hid; he was unable to find her because his face was bleeding and his eyes were swollen. S.B. explained that she did not report the rape to the police because she felt justified in hurting relator with the beer bottle and felt that she had gotten "satisfaction." She did tell a couple of her friends and her daughter about the incident that night or the next day. When the police interviewed her during the investigation of the instant victim's murder, she told them about this incident.
On cross-examination, S.B. stated she had never dated relator or had sexual relations with him before. She conceded she had smoked one rock of crack cocaine and drank about a quart of Busch beer a couple of hours before the rape. S.B. admitted to being a crack addict and that she last smoked some before noon on the day before the hearing. She testified that she did not smoke or drink anything that day before testifying. S.B. did not know if the rape had occurred near a pond because it was dark and she did not get out of the car. After the rape, she did not go to the hospital or seek any medical treatment.
Thereafter, at the State's request, the court issued an attachment for W.H., who was subpoenaed, but failed to appear for the hearing. The State reserved the right to call this witness at a continuation of the Prieur hearing.
The State argued that the testimony of Sgt. Sperling, S.R., and S .B. was credible and established that the acts occurred. It also argued that the acts showed the intent and identity of the person who committed the murder, as well as a system or method of operation.
Defense counsel argued that La. C.E. art. 404(B) was designed to prevent the type of evidence the State sought to introduce. Counsel also noted that none of the other alleged victims were murdered and these alleged acts of rape did not meet the criteria of a signature crime to connect relator to the instant murder. Counsel noted that relator was charged with murder, not rape. And, finally, defense counsel argued that there was little or no probative value in the purportedly unrelated and unproven acts and the prejudice would far outweigh any probative value.
The trial court noted that La. C.E. art. 1103, which indicated the applicability of the clear and convincing standard to other *890 crimes evidence, had been repealed, leaving La. C.E. art. 1104 in place, which states that the standard of proof is that of the Federal Rules of Evidence.[3] The court further stated that the clear and convincing standard was definitely changed and concluded that standard stated by the United States Supreme Court in Huddleston was applicable as to the proper burden of proof. The court stated that it found all of the testimony to be credible and, therefore, admissible at trial. The trial court cautioned the State that, at trial, the incident involving relator's rape of L.D. would have to be proved by live witness testimony, rather than by hearsay.
The court concluded that all three incidents described at the hearing were evidence of a method of operation and system; they involved the identity of relator and evidence of a motive for the abduction of the instant victim, perhaps "a design to have sex upon her." The court also noted that the evidence might tend to establish the absence of an accident or mistake, if any such defense of an accidental killing were raised at trial. The court noted that it applied the balancing test required under La. C.E. art. 403,[4] and while Prieur evidence is always highly prejudicial, the court found the evidence admissible. Finally, the trial court informed the State that it expected a specific jury instruction to be drafted prior to trial on the purpose for which the evidence was being admitted.
At the continuation of the Prieur hearing on May 18, 1998, W.H., age twenty-five, testified that she has known relator for nine or ten years and knew him from the Hammond neighborhood where she previously lived. She also indicated that her mother previously lived with relator's brother. On April 15, 1992, she was in a bar when she asked relator to take her to her home. He agreed, but instead of driving her home, he took her down Coonville Road, put a pocketknife to her throat and said she was going to have sex with him or he was going to `cut her throat. W.H. testified that they wrestled over the knife; she cut her hand but managed to get out of the car and run. When she got to the highway, she stopped a friend who was passing by and the friend gave her a ride home. At home, her mother called the police and W.H. went to the hospital where she identified relator as the perpetrator.
Relator was charged with attempted rape and aggravated assault. W .H. later dropped the charges. She explained that her mother suffered from high blood pressure and was very sick when the incident occurred. After the incident, relator's mother went to W.H.'s mother's house every day "worrying her." She dropped the charges to keep relator's mother away from her mother, who has since died.
On the night of the incident, W.H. left the bar at about 12:30 p.m. She admitted that she had two or three beers before *891 leaving the bar, but was not intoxicated and knew what was happening.
The defense did not offer any evidence at either hearing. The State submitted the matter on the prior arguments. Defense counsel challenged W.H.'s credibility and stated that this incident was not similar to the instant murder, which involved a minor child. Finally, defense counsel concluded that the State had not met its burden of proof under "the old standard of Prieur."
The trial court ruled W.H. was a credible witness and that the evidence showed a pattern of conduct. Thereafter, defense counsel objected that the evidence was more prejudicial than probative, but the court observed that those objections were heard and ruled upon at the prior hearing.

BURDEN OF PROOF
To be admissible under La. C.E. art. 404(B), evidence of the defendant's prior bad acts must meet two criteria: (1) it must be relevant to some issue other than the defendant's character, and (2) its probative value must be greater than its potential to unfairly prejudice the jury. See United States v. Gonzalez-Lira, 936 F.2d 184, 189 (5th Cir.1991); United States v. Beechum, 582 F.2d 898, 911 (5th Cir. 1978) (en banc), cert. denied, 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979) (interpreting Fed. R Evid 404(b.)). The Government is not required to show that the defendant was convicted as a result of the prior bad acts; by its terms, La. C.E. art. 404(B) encompasses "wrongs" and "acts" in addition to "crimes." Gonzalez-Lira, 936 F.2d at 189. Thus, contrary to relator's assertion herein, the State need not prove the other crimes evidence by clear and convincing evidence. There is no doubt that when the legislature enacted La. C.E. art. 1104, then repealed La. C.E. art. 1103, the clear and convincing standard for the admission of other crimes evidence was removed. As correctly noted by the State and the trial court, the current standard is enunciated in Huddleston. In that case, the Supreme Court resolved a split among the federal courts of appeal, rejected the clear and convincing evidence burden of proof, and concluded that "similar act" and other Rule 404(b) evidence "should be admitted if there is sufficient evidence to support a finding by the jury that the defendant committed the similar act."485 U.S. at 685, 108 S.Ct. at 1499.[5] "In determining whether the Government has introduced sufficient evidence..., the trial court neither weighs credibility nor makes a finding that the Government has proved the conditional fact by a preponderance of the evidence. The court simply examines all the evidence in the case and decides whether the jury could reasonably find the conditional fact ... by a preponderance of the evidence." 485 U.S. at 690, 108 S.Ct. at 1501.[6]
*892 We have reviewed the evidence introduced at the Prieur hearings and find no error in the trial court's ruling that this evidence of the defendant's previous sexual attacks upon four female victims, ranging in age from fifteen to approximately forty years old, should be admissible at the trial. Under the Huddleston standard, the State presented sufficient evidence to support a finding by a jury, by a preponderance of the evidence, that the defendant committed the four prior acts. Given the uncontradicted testimony of the four females who testified, a jury could have reasonably concluded that the defendant committed the acts each victim described had been committed against her.
Next, the Prieur evidence is relevant to an issue other than the defendant's character. The evidence established that the defendant offered rides to females, and when some distance from home, he used physical force and threats to rape (or attempt to rape) them. This evidence is relevant to establishing the identity of the perpetrator of the instant crime as well as the system he used to accomplish the crime. It shows that the defendant, as the actor in these other events, used a motor vehicle to isolate female victims, and then exercised dominion and control over them to commit criminal acts upon them. In the instant offense, the victim suffered some form of sexual trauma and died from blunt trauma to the head. Her body was discovered in a pond some distance from her home. A witness observed relator in a car at this pond on the last day the victim was seen alive. Physical evidence consisting of blood found in the backseat of this car driven by relator was matched to the victim through DNA analysis. The facts of the instant crime, when compared to the facts of the defendant's prior bad acts, tend to show that the person who used a motor vehicle to isolate female victims and who exercised control over them in order to commit criminal acts upon them in the prior acts is the same person who used a motor vehicle to isolate the victim in this case and who exercised control over her and then murdered her. In the event the defendant produces contradictory evidence that he did not intend to harm the victim, a jury could reasonably find by a preponderance of the evidence that these other acts support a finding that he intentionally used force to accomplish these other acts, and it can therefore be reasonably inferred that he intentionally used force to accomplish the instant crime.
Last, we conclude the trial court did not abuse its discretion in ruling that the probative value of the Prieur evidence outweighed its prejudicial effect in this case. The State's case was based on circumstantial evidence. Therefore, the identity and system of the person who murdered the victim are critical issues. The Prieur evidence is highly probative with regard to these issues, although it is also very prejudicial. We note the defense did make effective use of cross-examination to weaken the prejudicial effect of the Prieur evidence by attacking the credibility of certain witnesses.[7] Ultimately, questions regarding the admissibility of evidence are within the discretion of the trial court and should not be disturbed absent a clear abuse of that discretion. State v. Mosby, 595 So.2d 1135, 1139 (La.1992). We find no abuse of discretion in this case. Accordingly, *893 this Prieur evidence shall be properly admissible at the instant trial.
For the foregoing reasons, the ruling of the trial court, granting the State's Prieur motion, is AFFIRMED.
WEIMER, J., concurs and assigns reasons.
WEIMER, Judge, concurring.
I concur in the result and write separately regarding the burden of proof issue, although, I cannot state that my colleagues are in error.
Relative to the appropriate burden of proof of other crimes, wrongs, or acts evidence, at the risk of being accused of stating the obvious, it is easier to recite what is not the burden of proof than what is the burden of proof. The burden of proof is not by clear and convincing evidence.
Louisiana Code of Evidence article 1104 requires that:
The burden of proof in a pretrial hearing held in accordance with State v. Prieur, 277 So.2d 126 (La.1973), shall be identical to the burden of proof required by Federal Rules of Evidence Article IV, Rule 404.
Huddleston v. United States, 485 U.S. 681, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988), is the leading case interpreting the Federal Rule referenced in Article 1104. As indicated in note 4 of the majority opinion, exactly what Huddleston means in not clear.
As succinctly stated in Berrigan, La. Crim. Trial Prac. (3rd Ed.), § 20-25, p. 441:
In order for the evidence [of the other crimes, wrongs, or acts] to be admissible, it must be relevant for a purpose other than to depict the accused as a bad person; the independent issue such as intent, knowledge, motive or identity must be a real and truly contested question at trial; and the probative value of the testimony must outweigh its prejudicial impact. Undue prejudice means the jury would tend to find the accused guilty not on the probative value of the other crimes evidence but on the heinous or inflammatory nature of the evidence itself. The state has to establish the defendant committed the prior act by a preponderance of the evidence. (Footnotes omitted, emphasis in original.)[1]
I believe that the state should establish the defendant committed the prior crimes, acts, or wrongs by a preponderance of the evidence. Thereafter, the court must apply the criteria set forth in LSA-C.E. art. 404 B and then determine if the probative value is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time." LSA-C.E. art. 403.
To apply the criteria suggested by the majority would require the trial court to determine whether the jury could reasonably find the defendant committed the act by a preponderance of the evidence. This would require placing the trial court in a position of speculating as to what the jury would find.
I opt for a simpler and more practical solution. The trial court would simply determine whether the state proved the defendant committed the prior crimes, acts, or wrongs by a preponderance of the evidence. It is a burden of proof that is easily understood and applied. It is a burden of proof with which judges are familiar.
Additionally, because other crimes, acts, and wrongs evidence is prejudicial, this slightly higher burden of proof properly comports to the presumption of innocence afforded the defendant.
NOTES
[1] State v. Prieur, 277 So.2d 126 (La.1973).
[2] The victim was relator's niece. Her grandmother is relator's mother.
[3] Former La. C.E. art. 1103 provided:

Article 404(B) and 104(A) neither codifies nor affects the law of other crimes evidence, as set forth in State v. Prieur, 277 So.2d 126 (La.1973), State v. Davis, 449 So.2d 466 (La.1984) and State v. Moore, 278 So.2d 781 (La.1972) and their progeny, as regards the notice requirement and the clear and convincing evidence standard in regard to other crimes evidence. Those cases are law and apply to Article 404(B) and 104(A), unless modified by subsequent state jurisprudential development.
However, La. C.E. art. 1103 was repealed by 1995 La. Acts No. 1300, § 2, effective August 15, 1995. Article 1104 was added by 1994 La. Acts 3rd Ex.Sess. No. 51, § 2, effective August 27, 1994. Article 1104 provides:
The burden of proof in a pretrial hearing held in accordance with State v. Prieur, 277 So.2d 126 (La.1973), shall be identical to the burden of proof required by Federal Rules of Evidence Article IV, Rule 404.
[4] Louisiana Code of Evidence article 403 provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time.
[5] Our Supreme Court was presented with an opportunity to decide the appropriate other crimes evidence burden of proof in State v. McArthur, 97-2918 (La.10/20/98), 719 So.2d 1037, 1039 n. 1, but it declined to do so. Instead, less than one month after McArthur, the Supreme Court ordered this Court to decide the appropriate burden of proof in this matter, which we have now done. We note that our conclusion herein is identical to that reached by Justice Traylor in his concurring opinion in State v. Connolly, 96-1680 (La.4/28/98), 707 So.2d 1249. We further note that in State v. Miller, 97-0037 (La.App. 1 Cir. 12/29/97), 704 So.2d 1279, 1280, this court previously concluded that the appropriate burden of proof was that as announced in Huddleston. However, while affirming our decision, the Supreme Court restated the old burden of clear and convincing evidence. State v. Miller, 98-0301 (La.9/9/98), 718 So.2d 960, 962.
[6] Various courts have interpreted Huddleston differently. Some courts indicate that, after Huddleston, other crimes evidence is admissible only if the trial court finds or the government proves, by a preponderance of the evidence, that the defendant committed the prior act. See e.g., United States v. Adediran, 26 F.3d 61, 63 (8th Cir.1994), and United States v. Vance, 871 F.2d 572, 573 n. 1 (6th Cir. 1989), cert. denied, 493 U.S. 933, 110 S.Ct. 323, 107 L.Ed.2d 313 (1989). Other courts, however, reject this interpretation of Huddleston and indicate that the trial court need not determine that the Government has proved the act by a preponderance of the evidence. The court's role is to examine all the evidence in the case and determine whether a jury could reasonably find the defendant committed the act by a preponderance of the evidence. See e.g., United States v. Platero, 72 F.3d 806, 813-814 (10th Cir.1995) and United States v. York, 933 F.2d 1343, 1351-1352 (7th Cir.1991), cert. denied, 502 U.S. 916, 112 S.Ct. 321, 116 L.Ed.2d 262 (1991). Under either standard, the other crimes evidence at issue in this case would be admissible.
[7] The defendant's attack on the credibility of witnesses at trial will be limited by La. C.E. arts. 608, 609.1 and 611. Therefore, reference at trial to one of the witnesses as a "crack addict," (as was done by defense counsel in brief) without evidence of conviction for a drug-related offense should be avoided.
[1] Huddleston is cited in footnote 8 of this passage from Berrigan's Louisiana Criminal Trial Practice without further analysis as to its meaning.